LEWIS, J.,
dissenting.
I agree with Justice Perry and, in my view, this case turns in large part on the legal effect of section 121.011(3), Florida Statutes (2010). Section 121.011(3), as it existed prior to the amendment that has generated this litigation, provided:
121.011 Florida Retirement System.—
[[Image here]]
(3) PRESERVATION OF RIGHTS.—
(a) The rights of members of the retirement systems established by chapters 122, 238, and 321 shall not be impaired, nor shall their benefits be reduced by virtue of any part of this chapter, except that if an eligible member of a retirement system established by chapter 122, chapter 238, or chapter 321, elects between April 15, 1971, and June 1, 1971, inclusive, to transfer to the Florida Retirement System, he or she shall be transferred to the Florida Retirement System on June 1, 1971, and shall be subject to the provisions of the Florida Retirement System established by this chapter and at retirement have his or her benefits calculated in accordance with the provisions of s. 121.091.
(b) The rights of members of any retirement system established by local or special act or municipal ordinance shall not be impaired, nor shall their benefits be reduced by virtue of any part of this chapter.
[[Image here]]
(d) The rights of members of the retirement system established by this chapter shall not be impaired by virtue of the conversion of the Florida Retirement System to an employee noncontributory system. As of July 1, 1974, the rights of members of the retirement system established by this chapter are declared to be of a contractual nature, entered into between the member and the state, and such rights shall be legally enforceable as valid contract rights and shall not be abridged in any way.
[[Image here]]
§ 121.011(3)(a), (b) & (d), Fla. Stat. (2010). Subsection (d) was originally enacted in this same form effective October 1, 1974, see ch. 74-302, § 1, at 937, Laws of Fla., and has been continually reenacted each year since. Effective January 1, 1975, the FRS was converted to a noncontributory system. See eh. 74-302, §§ 4, 13, Laws of Fla.; § 121.071(2)(a), Fla. Stat. (1975). Prior to 2011, section 121.071 provided that contributions to the retirement system would be made only by the employers and none by the employees. The statute has meaning and must be given effect. This statutory provision, as with all others, cannot be simply ignored.
It is clear that in 1974, the Legislature changed the FRS to a mandatory, noncontributory pension system for most employees and enacted .section 121.011(3)(d), the provision of critical concern. During the thirty-seven years since the adoption of the preservation of rights provision, the FRS has remained noncontributory and has provided retirees a cost-of-living adjustment throughout retirement. The foregoing statutory provisions, of legislative origin, create and establish contractual rights and obligations with regard to the employment relationship of certain workers. We cannot become involved with the wisdom or judgment in establishing.these rights just as we do not evaluate the wisdom of subsequently enacting statutory provisions that may be in conflict with *394 earlier established law. The quoted statutory provisions are clearly and firmly part of Florida law just as any other legislation and we cannot simply ignore the earlier statutory rights in favor of later statutes which create conflict. This conflict impacts a significantly important category of Florida workers, our first responders, those who provide safety and security for all citizens, those who provide education and safety for our children, and thousands of other Floridians who provide essential services for all Floridians each and every day. These governmental employees are not second class citizens but are entitled to the full protection of the law just as all other Floridians enjoy. The contractual rights of government employees as established in the statute we consider today cannot receive lesser protection than other contractual rights because to do so would violate the “rule of law” and reduce all to the status of being subject to the whim of those who may be in power at any particular time and from time to time. The interpretation advanced by Justice Pariente is certainly without support and contrary to logical analysis. Justice Pariente seeks to justify and bolster this approach by suggesting that the State may retroactively alter vested rights and change its obligations without statutory authority to the contrary. In my view, this is not supported by Florida or federal law in this context. Justice Pariente’s entire opinion is based on her statement that there is no “impairment of contracts” here, a position with which I fundamentally and profoundly disagree.
Senate Bill 2100, which was passed in the 2011 legislative- session and became effective July 1, 2011, changes the FRS in several pertinent respects, although most of the changes affect employees initially enrolled after the effective date of the new statute and are not challenged in this action. Two changes to the FRS made by the 2011 amendments that affect employees who were members of the FRS prior to the effective date of the enactment were challenged — the mandatory 3% contribution and the elimination of cost-of-living adjustment for service occurring after July 1, 2011, for preexisting employees. The legislation also decreases the amount employers must contribute to the FRS for the benefit of their employees by more than half for nearly every membership class.
The FRS has been operating well above the 80% funding ratio recommended by experts and according to the State Board of Administration, which is responsible for investing funds deposited in the FRS, the FRS is one of the most well-funded and healthiest public pension funds in the United States. Florida faced a serious budget shortfall of approximately $3.6 billion at the start of the 2011 legislative session. The Legislature calculated the savings to be achieved from the challenged portions of Senate Bill 2100 to be approximately $861 million.
The unrebutted expert testimony establishes that the fiscal impact on the plaintiffs ranges from $12,445.81 to $329,683.56 over the span of their working years and retirement if they receive no future raises; and that the elimination of the COLA alone will result in a 4% to 24% reduction in the plaintiffs’ total retirement income. Senate Bill 2100 does not provide any increased or improved retirement benefits. There was also record evidence, unrebut-ted, that the Legislature’s appropriations for 2011-2012 left nearly $1.2 billion in general revenue unspent for the year.
Impairment of Contract
The circuit court concluded as a matter of law, and I agree, that it was required to follow the express language of section 121.011(3)(d), which cannot be read as allowing the Legislature to redefine estab *395 lished, unconditional contractual rights under Chapter 121 as suddenly tied to years of service and thereby altogether eliminated in the future. Such a reading would render the express contract created by section 121.011 (3) (d) wholly illusory, contrary to the view of Justice Pariente. The trial court concluded, and I also agree, that this Court’s decision in Florida Sheriffs Ass’n v. Department of Administration, 408 So.2d 1033 (Fla.1981), authorizes the Legislature to make prospective alterations to benefits which accrue for future state service within the mandatory, noncontributory plan, but cannot be read as authorizing the Legislature to change the fundamental nature of the plan itself because the Legislature is precluded by section 121.011(3)(d) from abridging in any way the unconditional contractual rights of the plaintiffs. The trial court stated:
The changes at issue here, a complete change of the plan from noncontributory to a contributory plan, and the elimination of entitlement to a cost-of-living adjustment, are qualitative changes to the plan, not changes to individual components of future accruals within the plan. FRS members have had continuous, unconditional rights to a noncontributory plan with a cost-of-living adjustment since the inception of FRS; these elements are not related to future state service. Because the Sheriffs case did not reach or contemplate changes such as these, this Court is bound to follow the express language of section 121.011(3)(d), Florida Statutes.
The trial court concluded, and I agree, that under State v. Gadsden County, 229 So.2d 587 (Fla.1969), the Legislature can, as part of its power to contract, authorize a contract which vests rights that a future legislature cannot impair; and the court below concluded that the Legislature did so when it adopted section 121.011(3)(d).
The challenged portions of Senate Bill 2100 impair vested contract rights, and such impairment is substantial, as considered in Pomponio v. Claridge of Pompano Condominium, Inc., 378 So.2d 774, 779-80 (Fla.1979). The facts here show the fiscal impact on individuals ranges from $12,445.81 to $329,683.56.
In Chiles v. United Faculty of Florida, 615 So.2d 671, 673 (Fla.1993), we held that before the Legislature can reduce previously approved appropriations to pay workers’ salaries made pursuant to a collective bargaining agreement, there must be no other reasonable alternative means of preserving the contract with the public workers in whole or in part and the Legislature must demonstrate a compelling state interest. The State has failed to meet its burden under this test because facing a budget shortfall is not enough. The undisputed record here indicates that other reasonable alternatives existed to preserve the state’s contract to the FRS, and the Legislature preserved $1.2 billion in unspent general revenue funds for the 2011-12 fiscal year. The trial court found that the Florida Legislature chose to effectuate the challenged provisions of Senate Bill 2100 in order to make funds available for other purposes. The trial court also concluded that there is no evidence that the integrity of the FRS was the basis for the Legislature’s actions. The retirement benefits protected by contract, as established by the Legislature, were simply taken from our first responders, those who protect us, those who teach and protect our children and others who have provided us services every day, to be used for other purposes.
Under the Florida Constitution, the mandatory 3% contribution and the elimination of the cost-of-living adjustment violate article X, section 6, of the Florida Constitution because the requirements *396 constitute a taking without full compensation being paid to the owner of the property. Contract rights are property rights within the meaning of article X, section 6, based on U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1, 19 n. 16, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). The taking of the members’ money was done for the public purpose of balancing the state budget even though there is no evidence that the integrity of the FRS was the basis for this action. Senate Bill 2100 does not compensate the members for this taking and further prohibits the payment of interest on the contributions made by the member if the member leaves and requests return of the monies contributed.
Impairment of Collective Bargaining Rights
The right of public employees to bargain collectively over wages, hours, and other terms and conditions of employment, which right is also constitutionally protected by article I, section 6, of the Florida Constitution, is abridged by Senate Bill 2100, which effectively removes those issues from the collective bargaining process, thereby rendering those negotiations after the fact futile. Retirement pensions and benefits are mandatory subjects of collective bargaining and include the right to effective bargaining. City of Tallahassee v. Pub. Emp. Relations Comm’n, 410 So.2d 487 (Fla.1981); Hillsborough Cty. Gov’t Employees Ass’n v. Hillsborough Cty. Aviation Auth., 522 So.2d 358 (Fla.1988). There is no legal authority authorizing the Legislature to unilaterally change a mandatory subject of collective bargaining in substantive legislation and there is no compelling state interest shown to support such action.
After the circuit court held the provisions of chapter 2011-68 (enacting Senate Bill 2100) unconstitutional on the foregoing grounds, the court then permanently enjoined the State from implementing the provisions as to individuals such as the plaintiffs, and ordered reimbursement with interest of the funds withheld from the compensation or cost-of-living adjustments of all public employees who were members of FRS prior to July 1, 2011.
No motion for rehearing was filed by the State raising a claim that the remedy was improper or that it failed to provide sufficient flexibility to the State to determine the source and timing of refunds. It might also be noted that when the State appeared at the preliminary injunction hearing early in the litigation, at the time the case was proceeding as a possible class action, the State did not indicate any special problems would arise in determining the source for a refund if a refund was ordered. Instead, the State assured the court that the refund money would be made available.
All public employees including teachers, first responders, deputies, correctional officers, nurses, and social workers who were members of the FRS prior to July 1, 2011 have had their contract rights violated. The qualitative changes to the FRS in Senate Bill 2100 that not only reduce the amount of ultimate benefits but also change the method of calculating them are entirely unlike the changes at issue in Florida Sheriffs upon which the majority relies. Florida Sheriffs simply does not govern the present case. Furthermore, because the changes in Senate Bill 2100 substantially reduce the public employees’ lifetime retirement benefits, the changes constitute an impermissible retroactive impairment as a matter of law. This Court should recede from Florida Sheriffs or limit the decision to its facts because it is unsound in principle and there has been no detrimental reliance upon the decision. The Court’s interpretation of the statute in Florida Sheriffs is contrary to the plain, *397 unambiguous language of the statute we must apply. The statute evinces a clear intent to create a contract protecting a member’s overall retirement rights and does not limit that protection to “accrued” or “earned” rights. Those terms are not contained in the statute. Additionally, pre-Florida Sheriffs precedent cannot properly be used as a basis to depart from the clear language of the statute. Because of the fundamental contract right involved, the unsoundness of the Florida Sheriffs decision, and the lack of substantial reliance, the Court should recede from Florida Sheriffs or limit it to its facts, adhere to the plain language of Section 121.011(8)(d), and find that the statute creates a binding contract that precludes changing the rights of FRS members unless the change is permissible under the test for impairment of contract.
The Legislature asserts a view of the history of the law not argued by the State below. The only relevant legislative history from 1974 cited by the parties is the committee report cited by the public employees. See H.R. Comm, on Retirement, Personnel and Claims, Legislative Program Overview, (June 24, 1974) (available at Fla. Dep’t of State, Florida State Archives). In discussing section 121.011(3)(d), the Committee stated that this section was included to “help alleviate the fears of certain members ... that once the system was made non-contributory, the Legislature would feel free to change retirement benefits since the employee was no longer contributing to the system.” Regardless, the language in section 121.011(3)(d) is clear and unequivocal. The contract rights in that statute have not been limited to accrued benefits. Section 121.011(3)(d) states that the relationship between the member and the State is “contractual in nature,” grants “valid contract rights” which are “legally enforceable,” and cannot be “abridged in any way.” This statutory language evinces an unmistakable intent to bind the state contractually.
The state action we consider today constitutes a taking of private property without compensation. The constitutional takings clause is to prevent the government from forcing some people alone to bear a burden that should be shared. The state action here constitutes a confiscation of private property of a few for a public use. The State’s contention that there is no taking because the contributions “are applied to [the members’] own retirement” reflects a misunderstanding of the nature of the property rights protected under section 121.011(3)(d). This provision grants public employees enforceable rights to a noncontributory retirement plan with a COLA; thus, the taking of those rights without any offsetting benefit constitutes a taking. Even to the extent member contributions are “to be used for the members’ own retirement” (which is true for the Investment Plan but not for the Pension Plan or the COLA), they do not constitute additional funds applied to the members’ retirement. By eliminating the COLA, the amendments significantly reduce the retirement benefits for members of the Pension Plan. The mandatory deduction of private funds in exchange for a reduced benefit is an unconstitutional taking.
Retirement is also a mandatory subject of collective bargaining. The trial court below correctly held that article I, section 6, of the Florida Constitution requires that the Legislature not completely ignore the right to collectively bargain when passing legislation affecting retirement, an established mandatory subject of bargaining. The State’s claim that the Legislature’s appropriations power supersedes public employees’ rights under article I, section 6, is without merit. The State’s reliance on *398 State v. Florida Police Benevolent Ass’n, Inc., 613 So.2d 415 (Fla.1992), is misplaced. That case involved a completely different issue — whether the Legislature is required to fund a provision of a collective bargaining agreement — and says nothing about whether the Legislature may, through substantive legislation, unilaterally change a mandatory subject of collective bargaining. Id. at 421.
This Court’s decisions hold that legislative enactments, including those involving appropriations, are limited by article I, section 6. Article I, section 6, guarantees the right to effective collective bargaining. The trial court correctly recognized that there can be no effective bargaining only after the fact where, as here, the Legislature has unilaterally predetermined the term or condition through statute, rendering any subsequent negotiations futile. The Legislature has the power to make policy affecting subjects of negotiations, but it does not have the power to unilaterally amend the law that effectively excuses negotiation altogether.